**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **EDGAR L. MERIDA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-1992** |
| **BOARD OF COMMISSIONERS OF THE SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY–EAST, ET AL.** | **SECTION "O"** |

## <u>ORDER AND REASONS</u>

Before the Court in this employment-discrimination case is the renewed motion[1] of Defendants—the Board of Commissioners of the Southeast Louisiana Flood Protection Authority–East (the "Board"), Kelli Chandler, Terrance Durnin, Michael Brenckle, Donald Juneau, and Kenny Pinkston—for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Defendants contend that the Court should dismiss all of Merida's claims except (1) his Title VII claim against the Board, and (2) his 42 U.S.C. § 1983 claims against the Board and Chandler.

The Court obliges in all but two respects. First, because Defendants have not shown that Merida seeks relief on his state-law equal-protection claims that would invade the exclusive jurisdiction of the Louisiana Civil Service Commission, the Court does not dismiss those claims now. And second, because Merida has pleaded facts plausibly establishing that Pinkston's alleged conduct was sufficiently severe or pervasive to alter the conditions of Merida's work environment, the Court does not dismiss Merida's Section 1983 hostile-work-environment claim against Pinkston at

---

[1] ECF No. 26.

this stage. All other claims the Rule 12(c) motion targets are prescribed, inadequately pleaded, legally deficient, or abandoned. Accordingly, for these reasons and those that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

This employment dispute arises from racial and religious discrimination that Plaintiff Edgar Merida, a self-described "Hispanic–Jewish senior male,"[2] alleges that he endured while working for the Board as a State Civil Service "classified"[3] police officer.[4] At the core of the case is Merida's claim that Defendants—the Board, four of Merida's former co-employees, and the administrator empowered to hire and fire the Board's State Civil Service classified police officers—subjected Merida to a hostile work environment, conspired to deprive him of his rights as a State Civil Service classified police officer, and fired him in violation of State Civil Service rules.[5]

The Board "govern[s]" the Southeast Louisiana Flood Protection Authority–East, "a State instrumentality"[6] that wields "authority over and . . . management, oversight and control of" the East Jefferson, Lake Borgne, and Orleans Levee Districts. *See generally* LA. STAT. ANN. §§ 38:330.1 & 38:330.2. Louisiana law empowers the Southeast Louisiana Flood Protection Authority–East to "employ a superintendent of police security" as well as  "police security personnel" "in the

---

[2] ECF No. 28 at 1.

[3] Louisiana law distinguishes between the "classified" and the "unclassified" civil service. *See* LA. CONST. ANN. art. X, § 2. A permanent, classified civil-service employee has a protected property interest in his job. *Lange v. Orleans Levee Dist.*, 2010-0140, p. 6 (La. 11/30/10); 56 So. 3d 925, 930.

[4] *See generally* ECF No. 1-1 at 4–19 (original petition); ECF No. 23 (first supplemental and amending complaint). The facts set out in this section are drawn from uncontested Louisiana law and the allegations of the original petition and the first supplemental and amending complaint.

[5] *See generally* ECF No. 1-1 at 4–19; ECF No. 23.

[6] ECF No. 1-1 at 5 ¶ 11.

interest of public safety." *See* LA. STAT. ANN. § 38:330.7(B)–(C). Commissioners of the Board in turn "exercise authority over employees" of the Orleans Levee District Police Department and the East Jefferson Levee District Police Department.[7]

Merida self-describes as a man of "Hispanic heritage and Jewish religious belief."[8] The Board hired him "as a state civil service Police Officer IIA" in late August 2019 and assigned him to the East Jefferson Levee District Police Department.[9] Just over four months later, in early January 2020, the superintendent of the Board-controlled police departments, Kerry Najolia, "temporarily assigned" Merida to an "FBI Task Force Program as an investigator from" the East Jefferson Levee District Police Department.[10] The investigator position that Merida temporarily held "later became a State Civil Service Classified position" titled "Police Investigator."[11]

About seven months after Merida received his temporary assignment from Najolia, in early August 2020, a representative from the Louisiana State Civil Service announced openings for the "newly created" "Police Investigator" position and solicited applications.[12] Merida applied for the position and "was one of the applicants recommended for appointment by an authorized civil service panel."[13]

At some unstated later point, Najolia instructed Merida to resign from his "Police Officer II A" position "for budget purposes only, simultaneously accept the classified position of Police Investigator, and remain assigned to the FBI Task Force

---

[7] *Id.* at 3 ¶ 1(A).
[8] *Id.* at 8 ¶ 29.
[9] *Id.* at 4 ¶ 3.
[10] *Id.* at 4 ¶ 4.
[11] *Id.* at 4 ¶ 5.
[12] *Id.* at 4 ¶ 6.
[13] *Id.* at 4 ¶ 7.

3

Program."[14] Merida "[f]ollow[ed]" Najolia's instructions: Merida resigned from his "Police Officer II" position and "immediately accepted the promotion" to the position of "classified Police Investigator" in early September 2020.[15]

Before Merida's promotion to "classified Police Investigator,"[16] Najolia "determined [that] each [Peace Officer Standards and Training (POST)] classified and certified police officer would serve a normal 12[-m]onth civil-service probationary period before becoming a permanent classified police officer."[17] That meant Merida's 12-month probationary period as a "Police Officer II A" would have ended in late August 2020, and Merida's 12-month probationary period as a "Police Investigator" would have ended in September 2021.[18] Merida "is informed and believes" that Najolia had authority to decide the applicable probationary periods because Merida "believes" that Najolia, as the Board's Superintendent of Police Security, "is the statutory appointing authority"—*i.e.*, the person "with the power to hire, assign, fire and promote [the Board's] commissioned classified state civil service police officers."[19]

At some unstated point later, Defendant Terrance Durnin, an employee of the East Jefferson Levee District Police Department, "wrote a voluntary statement" that "criticiz[ed]" Najolia and the federal-task-force-officer program in which Merida was participating.[20] In the statement, Durnin "accused Najolia of undermining" the

---

[14] *Id.* at 4–5 ¶¶ 8 & 10 (emphasis deleted).
[15] *Id.* at 5 ¶ 10 (emphasis deleted).
[16] *Id.* (emphasis deleted).
[17] *Id.* at 6 ¶ 15.
[18] *Id.* at 7 ¶ 18.
[19] *Id.* at 6 ¶ 14.
[20] *Id.* at 7 ¶ 20.

"authority" of Defendant Kelli Carol Chandler.[21] At the time, Chandler was serving as the "Regional Director" of the Board, the Orleans Parish Levee District Police Department, and the East Jefferson Levee District Police Department.[22] Chandler was also "the designated appointing authority,"[23] meaning that she had "the power to hire, assign, fire and promote" the Board's classified civil-service police officers, including Merida.[24] In the same statement, Durnin "accused" Merida and two others of being "part of Najolia's inner circle."[25] Durnin also "alleged" that "the [federal-task-force-officer] programs were creating a morale issue within the agency because of . . . lucrative assignments" given to members of "Najolia's inner circle."[26]

In mid-October 2021, Chandler held a meeting "to discuss the allegations contained in Durnin's statements and the operation of the [federal-task-force-officer] programs."[27] During the meeting, Merida told Chandler, Durnin, and the other attendees that the allegations in Durnin's statement "were biased and incorrect."[28] One of Merida's co-employees, Defendant Kenny Pinkston, "entered the meeting" and asked Merida, "[h]ow is my favorite Mexican–Spic–Jew Investigator[?]"[29] The remark caused Merida "embarrassment, humiliation, and extreme mental anguish."[30] This was not the first time Pinkston directed derogatory remarks at Merida; "on

---

[21] *Id.* at 7 ¶ 21.
[22] *Id.* at 3 ¶ 1(B).
[23] *Id.* at 7 ¶ 21; *see also id.* at 3 ¶1(B)
[24] *Id.* at 6 ¶ 14.
[25] *Id.* at 7 ¶ 21.
[26] *Id.* at 8 ¶ 24.
[27] *Id.*
[28] *Id.* at 8 ¶ 23.
[29] *Id.* at 8 ¶ 26 (emphasis deleted).
[30] *Id.* at 8 ¶ 27.

5

. . . numerous occasions," Pinkston "referred to [Merida] as a Jewish–Spic."[31] For her part, Chandler "took no action before, during[,] or after the [mid-October 2021] meeting" to stop Pinkston and others "from singling [Merida] out for ridicule and disparate treatment because of his Hispanic heritage and Jewish religious belief."[32]

At some unidentified point, presumably after the mid-October 2021 meeting, Chandler contacted the FBI "to file a formal disciplinary complaint" against Merida.[33] For that complaint, Chandler sought to establish cause to terminate Merida because, according to Chandler, Merida had "illegally revealed classified FBI information."[34] But an FBI agent "informed Chandler the information she believed to be classified was in fact public."[35]

About four months after the mid-October 2021 meeting, in mid-February 2022, Merida and Patrick Conaghan, another "classified Police Investigator[ ]," attended a "business meeting" of the Board "to speak on behalf of" the federal-task-force-officer programs.[36] Merida spoke about Chandler's decisions to stop the Board's participation in federal-task-force-officer programs and to reassign the Board's three police investigators—Merida, Conaghan, and Jerald Holmes.[37] Merida also told the Board that he did not know why he and Conaghan were the "target of comments and

---

[31] *Id.* at 8 ¶ 28 (emphasis deleted).
[32] *Id.* at 8 ¶ 29.
[33] *Id.* at 9 ¶ 30.
[34] *Id.*
[35] *Id.* at 9 ¶ 31.
[36] *Id.* at 9 ¶ 32.
[37] *Id.* at 9 ¶ 34.

untruths" in Durnin's statement.[38] During the meeting, Durnin "gave" Merida and Conaghan "the middle finger" and "muttered" "Fucking Spic" to Merida.[39]

Less than a month later, in March 2022, the Board fired Merida.[40] Chandler and the Board determined that Merida was "a probationary employee" who had not yet completed a 24-month probationary period for the "Police Investigator" position.[41] As a result of that determination, Merida did not receive a pre-termination hearing or an opportunity to be reinstated to the "Police Officer IIA" position he formerly held.[42] That determination also conflicted with what Najolia had "told" Merida–*i.e.*, that Merida "was a twelve[-]month probationary Police Investigator, a permanent Police Officer IIA, and [that] Merida would not receive a reduction in salary."[43]

The Board demoted—but did not fire—two other police investigators, Conaghan (a white man) and Holmes (a black man).[44] Unlike Merida, Conaghan and Holmes were permitted to return "to their previous permanent civil service positions of Police Officer IIA, with all Civil Service and Family Medical Leave benefits."[45]

The same day Merida was fired, Defendant Michael Brenckle, an employee of the Orleans Levee District Police Department, sent an email to Orleans Levee District Police Department officers, "informing them [Merida] was no longer allowed access to [Orleans Levee District Police Department] and [East Jefferson Levee

---

[38] *Id.* at 9 ¶ 35.

[39] *Id.* at 9 ¶ 33 (emphasis deleted).

[40] ECF No. 23 at 2 ¶ 2 (amending ¶ 38 of the original petition).

[41] ECF No. 1-1 at 10–11 ¶¶ 40–41.

[42] *Id.* at 10 ¶ 40.

[43] *Id.* at 11 ¶ 41 (emphasis deleted).

[44] *Id.* at 11 ¶ 42.

[45] *Id.*

District Police Department] police stations or any other [Board] property."[46] In the email, Brenckle said that Merida "had an active arrest warrant" issued by the New Orleans Police Department and that Merida had been charged with disturbing the peace.[47] Brenckle urged Orleans Parish Levee District Police Department "employees to use caution if confronted by [Merida]."[48] Defendant Donald Juneau forwarded Brenckle's email to officers of the East Jefferson Levee District Police Department.[49]

At some unidentified point after Merida was fired, Merida went to a New Orleans Police Department station to turn himself in.[50] But Merida "was informed there was no outstanding criminal warrant issued for his arrest."[51] Despite being informed "there was no outstanding warrant for [Merida's] arrest," Brenckle "continued to insist" that Merida "was not allowed on [the Board's] properties."[52]

Two days after Merida was fired, Conaghan visited the Orleans Levee District Police station "to discuss his upcoming retirement with . . . Brenckle."[53] During the conversation, Brenckle called Merida a racial slur that suggested Merida was "a Hispanic person who needs mental care and will cause a criminal disturbance."[54] Ultimately, Chandler and the Board allowed Conaghan "to exhaust his civil service and family leave benefits," "but did not grant [Merida] the same courtesy."[55]

---

[46] *Id.* at 11 ¶ 45.
[47] *Id.* at 11 ¶ 46.
[48] *Id.* at 12 ¶ 48.
[49] *Id.* at 12 ¶ 50.
[50] *Id.* at 12 ¶ 51.
[51] *Id.* at 12 ¶ 52.
[52] *Id.*
[53] *Id.* at 12 ¶ 53.
[54] *Id.* at 13 ¶ 55.
[55] *Id.* at 13 ¶ 56.

Merida appealed his firing to the State Civil Service Commission.[56] During those proceedings, a civil-service referee ruled that (1) Merida did not assert an "actionable claim" for political-belief discrimination based on Merida's being "considered to be a friend of Najolia and not aligned with . . . Chandler's supporters";[57] (2) the Civil Service Commission lacked jurisdiction over Merida's hostile-work-environment claims;[58] and (3) Merida lodged "sufficient" challenges (a) to the Board's determination that Merida was not a permanent employee as of his March 2022 termination and (b) to Chandler's status as "the proper appointing authority."[59] Those challenges "were set for a hearing,"[60] and the proceedings remain pending.

With those pending Civil Service Commission proceedings in the background, Merida brought a wide-ranging employment-discrimination lawsuit in state court in April 2023.[61] Merida sued (1) the Board; (2) Chandler, "individually and as Regional Director and/or Appointing Authority for" both the Orleans Levee District Police Department and the East Jefferson Levee District Police Department; (3) Durnin, "individually and as an employee of" the East Jefferson Levee District Police Department; (4) Brenckle, "individually and as an employee of" the Orleans Levee District Police Department; (5) Juneau, "individually[ ] and as an employee of" the Orleans Levee District Police Department; and (6) Pinkston, "individually and as an employee of" the East Jefferson Levee District Police Department.[62]

---

[56] *Id.* at 13 ¶ 57.
[57] *Id.* at 13 ¶ 61.
[58] *Id.* at 14 ¶ 62.
[59] *Id.* at 14 ¶ 63.
[60] *Id.*
[61] *See generally* ECF No. 1-1 at 3–18.
[62] *Id.* at 3–4 ¶¶ 1(A)–1(F).

9

Defendants removed the case to this Court based on federal-question jurisdiction,[63] 28 U.S.C. § 1331, and then moved for partial judgment on the pleadings under Rule 12(c).[64] In response, Merida supplemented and amended his original petition,[65] and the Court denied as moot Defendants' partial Rule 12(c) motion.[66]

In his original petition[67] and first supplemental and amending complaint,[68] Merida does not clearly identify (1) the causes of action he intends to assert; (2) the Defendant(s) he intends to assert those causes of action against; or (3) the capacity in which each Defendant is sued on each cause of action.[69] But the Court's best estimation is that Merida intends to bring these causes of action:

1. **Conspiracy:** Merida asserts a conspiracy claim under Section 1983 against Chandler, Durnin, Juneau, and Pinkston based on his allegation that Chandler "conspired with [D]efendants Durnin, Juneau, and Pinkston and carried out a plan to create a hostile work environment for [Merida]; target [Merida] for disparate treatment; and under color of law deprive [Merida] of his property right as a civil[-]service employee of [the Board] and employment in law enforcement in the future without just cause."[70]

---

[63] *See generally* ECF No. 1.

[64] ECF No. 12

[65] ECF No. 23.

[66] ECF No. 24.

[67] ECF No. 1-1 at 3–18.

[68] ECF No. 23.

[69] The scheduling order required Merida to "provide . . . a letter setting out (1) all causes of action asserted, (2) specific federal or state law basis for each cause of action, (3) a list of which specific causes are being brought against each defendant, and (4) whether each defendant is being sued as an individual and/or in his or her official capacity." ECF No. 13 at 2. Merida timely submitted such a letter, ECF No. 14, but it does not meaningfully illuminate the causes of action he intends to assert.

[70] ECF No. 23 at 1 ¶ 1 (amending ¶ 37 of the original petition).

2. **The Louisiana Constitution's Equal-Protection Clause:** Merida asserts a claim against the Board, Chandler, Durnin, and Pinkston under the Equal-Protection Clause of the Louisiana Constitution, LA. CONST. ANN. art. 1, § 3, based on Merida's allegation that Defendants denied him "equal protection of the laws" and arbitrarily discriminated against him "because of his race, heritage, culture, political ideal or affiliations."[71]

3. **Employment Discrimination:** Merida asserts claims against the Board, Chandler, Durnin, Juneau, and Pinkston for intentional discrimination in employment and for the creation of a hostile work environment under (A) the Louisiana Employment Discrimination Law ("LEDL"), LA. STAT. ANN. § 23:332(A)(1)–(2); (B) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; (C) 42 U.S.C. § 1981; and (D) 42 U.S.C. § 1983.[72]

4. **Tort Claims:** Merida appears to assert several tort claims, including (A) negligent-supervision claims against the Board and Chandler for "fail[ing] to properly supervise Durnin, Pinkston, Juneau, and Brenckle to prevent the creation of a hostile work environment, disparate treatment, and [the] unlawful termination of" Merida;[73] and (B) defamation claims against Brenckle and Juneau based on the allegation that "[t]he accusations made against [Merida] . . . in a public email constitute an unwarranted, false,

---

[71] *Id* at 2 ¶ 3 (amending ¶ 64 of the original petition).
[72] *Id.*
[73] *Id.*

malicious and libelous attack on his distinguished career in law enforcement and on his personal and professional reputation."[74]

Now, Defendants renew their partial motion for judgment on the pleadings under Rule 12(c), contending that the Court should dismiss all of the claims Merida intends to assert *except* (1) his Title VII discrimination claims against the Board, (2) his Section 1983 claims against the Board and Chandler.[75] Merida opposes.[76]

## II.   LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "The standard for dismissal 'is the same as that for dismissal for failure to state a claim under Rule 12(b)(6).'" *Johnson v. Miller*, 98 F.4th 580, 583 (5th Cir. 2024) (quoting *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015)). So, to survive a Rule 12(c) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Although '[courts] accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most

---

[74] ECF No. 1-1 at 15 ¶ 65.
[75] ECF No. 26.
[76] ECF No. 28.

favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true.'" *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (quoting *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023)).

## III.   ANALYSIS

Defendants move for partial judgment on the pleadings under Rule 12(c), contending that the Court should dismiss all of Merida's claims *except* (1) his Title VII claim against the Board, and (2) his Section 1983 claims against the Board and Chandler.[77] The Court considers each of Defendants' arguments in turn.

### A.    Equal-Protection Claims under the Louisiana Constitution

First, Defendants contend that the Court should dismiss Merida's claims under the Louisiana Constitution's Equal Protection Clause, *see* LA. CONST. ANN. art. I, § 3, because those claims come within the State Civil Service Commission's exclusive jurisdiction, *see* LA. CONST. ANN. art. X, § 12.[78] Defendants contend that the State Civil Service Commission has exclusive jurisdiction to decide Merida's equal-protection claims in the first instance because those claims arise from alleged discrimination in Merida's civil-service employment with the Board.[79] Defendants reason that, because Merida's equal-protection claims come within the State Civil Service Commission's exclusive jurisdiction, Merida cannot seek judicial relief on those claims until the State Civil Service Commission renders a final decision.[80] And

---

[77] ECF No. 26.
[78] ECF No. 26-1 at 8–10.
[79] *Id.* at 9–10.
[80] *Id.*

because the State Civil Service Commission has not yet rendered a final decision, Defendants submit that the Court should dismiss Merida's equal-protection claims.[81]

Merida rejoins that his Louisiana-law equal-protection claims are not subject to the exclusive jurisdiction of the State Civil Service Commission.[82] He reasons that his equal-protection claims are "not within the scope"[83] of the Commission's "quasi-judicial power"[84] because the Civil Service Commission cannot award him money damages.[85] He adds that his equal-protection claims "are fully supplementary to any remedy" he might receive through the State Civil Service Commission proceedings.[86]

Article X of "[t]he Louisiana Constitution grants legislative, executive, and judicial powers to the [State Civil Service] Commission." *Holliday v. State ex rel. La. Workforce Comm'n, Off. of Worker's Comp.*, 2017-0013, p. 3 (La. App. 1 Cir. 6/14/17); 224 So. 3d 380, 381–82 (first citing LA. CONST. ANN. art. X, § 10(A)(1); then citing LA. CONST. ANN. art. X, § 12(A); and then citing *Hawkins v. State ex rel. Dep't of Health & Hosps.*, 613 So. 2d 229, 232 (La. Ct. App. 1st Cir. 1992)).

Section 10(A)(1)(a) of Article X of the Louisiana Constitution defines the State Civil Service Commission's executive and legislative powers:

> Each commission is vested with broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel

---

[81] *Id.*
[82] ECF No. 28 at 11–15.
[83] *Id.* at 11.
[84] *Id.*
[85] *Id.* at 14.
[86] *Id.* at 15.

> matters and transactions; to adopt a uniform pay and classification plan; to require an appointing authority to institute an employee training and safety program; and generally to accomplish the objectives and purposes of the merit system of civil service as herein established. . . . .

LA. CONST. ANN. art. X, § 10(A)(1)(a).

The State Civil Service Commission's judicial power "is expressly limited to removal and disciplinary cases," *Hawkins*, 613 So. 2d at 232, and is defined in Section 12(A) of Article X of the Louisiana Constitution:

> The State Civil Service Commission shall have the exclusive power and authority to hear and decide all removal and disciplinary cases, with subpoena power and power to administer oaths. It may appoint a referee, with subpoena power and power to administer oaths, to take testimony, hear, and decide removal and disciplinary cases. The decision of a referee is subject to review by the commission on any question of law or fact upon the filing of an application for review with the commission within fifteen calendar days after the decision of the referee is rendered. If an application for review is not timely filed with the commission, the decision of the referee becomes the final decision of the commission as of the date the decision was rendered. If an application for review is timely filed with the commission and, after a review of the application by the commission, the application is denied, the decision of the referee becomes the final decision of the commission as of the date the application is denied. The final decision of the commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located, upon application filed with the commission within thirty calendar days after its decision becomes final. . . . .

LA. CONST. ANN. art. X, § 12(A).

Courts interpret Article X of the Louisiana Constitution "to grant exclusive jurisdiction to the Civil Service Commission in those areas where the Commission has exercised its broad and general rule-making power." *Akins v. Hous. Auth. of New Orleans*, 2003-1086, p. 3 (La. App. 4 Cir. 9/10/03), 856 So. 2d 1220, 1221 (internal quotation marks and citation omitted), *writ denied*, 2003-2781 (La. 12/19/03), 861 So. 2d 574. That means "Louisiana district courts do not have jurisdiction over

15

employment[-]related disputes such as reinstatement, back pay, and merit increases asserted by classified civil service employees against the state." *Kling v. La. Dep't of Revenue*, 2018-1480, p. 14 (La. App. 1 Cir. 7/18/19); 281 So. 3d 696, 708, *writ denied*, 2019-01434 (La. 11/5/19); 281 So. 3d 671, and *writ denied*, 2019-01441 (La. 11/5/19); 281 So. 3d 671. "The thrust of the grant of exclusive jurisdiction over employment-related disputes between employers and employees in civil service is to preclude the district court from having concurrent jurisdiction with the Civil Service Commission over such disputes." *Id.* at 709 (citing *Johnson v. Bd. of Supervisors of La. State Univ. & Agr. & Mech. Coll.*, 45,105, p. 6 (La. App. 2 Cir. 3/3/10); 32 So. 3d 1041, 1046).

But the Civil Service Commission's exclusive jurisdiction is limited. For example, the Commission "has no subject matter jurisdiction over tort cases and cannot award general monetary damages." *Id.* (citing *Johnson*, 32 So. 3d at 1046). So, Louisiana courts have concluded that Article X does not preclude a plaintiff from bringing a claim for "damages beyond the scope . . . of the Commission's jurisdiction." *Barringer v. Robertson*, 2015-0698, p. 3 (La. App. 1 Cir. 12/2/15); 216 So. 3d 919, 922 n.3, *writ denied*, 2016-0010 (La. 2/26/16); 187 So. 3d 1004; *cf. Huval v. State ex rel. Dep't of Pub. Safety & Corrs.*, 2016-1857, p. 10–11 (La. 5/3/17); 222 So. 3d 665, 671–72 (reasoning that Article X did not preclude wrongful-termination plaintiffs from bringing tort claims in a Louisiana district court because the relevant state agency was "powerless to award . . . the type of tort damages sought by plaintiffs").[87]

---

[87] *Huval* considered the jurisdiction of the State Police Commission. 222 So. 3d at 669–72. But *Huval* is instructive because (1) "the State Police Commission's power to hear and decide cases is identical to that granted the State Civil Service Commission," *id.* at 669 (internal quotation marks and citation omitted); and (2) *Huval* "look[ed] to" Civil Service Commission cases for "guidance," *id.*

Federal courts have similarly held that claims for "general tort damages" that the Commission cannot award are not subject to the Commission's exclusive jurisdiction and can be brought in court. *See, e.g.*, *Pike v. Off. of Alcohol & Tobacco Control of the La. Dep't of Revenue*, 157 F. Supp. 3d 523, 541 (M.D. La. 2015); *Jones v. Gee*, No. 18-CV-5977, 2020 WL 564956, at *6 (E.D. La. Feb. 5, 2020); *Edmonds v. New Orleans City*, No. 16-CV-298, 2017 WL 2671690, at *4 (E.D. La. June 20, 2017).

Here,  Defendants have not carried their burden to show that the Court should dismiss Merida's Louisiana-law equal-protection claims—at the pleadings stage and in their entirety—because they come within the Civil Service Commission's exclusive jurisdiction under Article X.[88] Unfortunately, the alleged factual basis for Merida's Louisiana-law equal-protection claims is unclear; Merida does not allege with any detail how he believes that any particular Defendant violated his rights under the Louisiana Constitution's Equal Protection Clause, specifically. It is clear, however, that Merida seeks general "damages beyond the scope . . . of the Commission's jurisdiction," *Barringer*, 216 So. 3d at 922, including damages for past, present, and future loss of income; loss of reputation in the community; and mental anguish.[89] And Defendants, for their part, have not shown that Merida seeks relief on his Louisiana-law equal-protection claims, specifically, that would "encroach upon the constitutional power and authority granted to the Commission." *Holliday*, 224 So. 3d at 382 (citations omitted). For example, Defendants have not shown that Merida

---

[88] Defendants do not ask the Court to stay this case or abstain pending the completion of Merida's pending Civil Service Commission proceedings. Nor do Defendants contend that Merida fails to plead facts plausibly establishing any element of a Louisiana-law equal-protection claim.

[89] ECF No. 23 at 3–4 ¶ 4 (amending ¶ 67 of the original petition).

seeks reinstatement, "an accounting for past due wages," or a "declaration as to [his] future wages" on his Louisiana-law equal-protection claim. *Id.*

Accordingly, because the Civil Service Commission "is powerless to award" Merida the general tort damages he requests, *Huval*, 222 So. 3d at 572, and because Defendants have not shown that Merida seeks any relief on his Louisiana-law equal-protection claims, specifically, that would "encroach upon the exclusive power and authority granted to the State Civil Service Commission," *Hawkins*, 613 So. 2d at 234, the Court concludes that Article X of the Louisiana Constitution does not bar Merida from bringing his Louisiana-law equal-protection claims. *See Pike*, 157 F. Supp. 3d at 541; *Jones*, 2020 WL 564956, at *6; *Edmonds*, 2017 WL 2671690, at *4.[90]

### B.   Employment-Discrimination Claims Against Co-Employees

Next, Defendants contend that the Court should dismiss the employment-discrimination claims Merida asserts against his former co-employees—Chandler, Durnin, Brenckle, Juneau, and Pinkston—because neither Title VII nor the LEDL creates a cause of action against an individual employee.[91] The Court agrees.

Merida fails to state any plausible Title VII claims against Chandler, Durnin, Brenckle, Juneau, and Pinkston. The allegations of Merida's complaints confirm that Chandler, Durnin, Brenckle, Juneau, and Pinkston are individual employees of the Board.[92] The Fifth Circuit "has held that there is no individual liability for employees

---

[90] The cases Defendants cite to support their exclusive-jurisdiction argument do not compel a contrary conclusion. *See* ECF No. 26-1 at 20. Those cases either pre-date, or do not address, the Supreme Court of Louisiana's 2017 opinion in *Huval*, which considered and ultimately rejected exclusive-jurisdiction arguments resembling those Defendants make here. *See* 222 So. 3d at 667–72.

[91] ECF No. 26-1 at 10–11.

[92] *See* ECF No. 1-1 at 3–4 ¶¶ 1(B)–1(F)

under Title VII." *Smith v. Amedisys Inc.,* 298 F.3d 434,448 (5th Cir. 2002) (first citing *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999); and then citing *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994)). Accordingly, because Chandler, Durnin, Brenckle, Juneau and Pinkston are individual employees who cannot be held liable under Title VII, Merida fails to state any plausible Title VII claims against them. So, the Court dismisses with prejudice all Title VII claims Merida intends to assert against Chandler, Durnin, Brenckle, Juneau and Pinkston.

Merida fails to state any plausible LEDL claims against Chandler, Durnin, Brenckle, Juneau, and Pinkston for essentially the same reason he fails to state any plausible Title VII claims against them. Like Title VII, the LEDL does not create a cause of action against an individual co-employee. *See Notariano v. Tangipahoa Par. Sch. Bd.*, 266 F. Supp. 3d 919, 928 (E.D. La. 2017) ("It is well established that Louisiana's antidiscrimination law provides no cause of action against individual employees, only against employers." (internal quotation marks and citation omitted)). The text of the LEDL confirms that the statute creates employment-discrimination liability only "for an employer." LA. STAT. ANN. § 23:332(A). The LEDL in turn defines "employer" in relevant part as "a person, association, legal or commercial entity, the state, or any state agency, board, commission, or political subdivision of the state receiving services from an employee and, in return, giving compensation of any kind to an employee." LA. STAT. ANN. § 23:302(2). And "[t]he provisions of [the LEDL] shall apply only to an employer who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the

19

current or preceding calendar year." LA. STAT. ANN. § 23:302(2). The allegations of Merida's complaints confirm that Chandler, Durnin, Brenckle, Juneau, and Pinkston are individual employees who do not meet the LEDL's definition of "employer."[93] Thus, because Chandler, Durnin, Brenckle, Juneau, and Pinkston are individual employees who cannot be held liable under the LEDL, Merida fails to state any LEDL claims against them. The Court dismisses with prejudice all LEDL claims Merida intends to assert against Chandler, Durnin, Brenckle, Juneau and Pinkston.

### C.    Tort Claims

Next, Defendants contend that Merida's negligence, intentional-tort, and defamation claims are time-barred.[94] Defendants reason that Merida's tort claims are barred by the one-year prescriptive period under the former Louisiana Civil Code Article 3492 because Merida filed this lawsuit in April 2023, and every event described in his complaints occurred on or before his firing on March 9, 2022.[95] Merida invokes the continuing-tort doctrine in response, but he does not explain how he believes that doctrine applies to save any of his specific tort claims.[96] "Rule 12(b)(6) dismissal under a statute of limitation is proper only when the complaint makes plain that the claim is time-barred and raises no basis for tolling." *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023) (internal citations and quotation marks omitted).

Merida's tort claims are untimely, and his complaints raise no basis for tolling. The prescriptive period is one year. *See* LA. CIV. CODE ANN. art. 3492, *repealed by*

---

[93] *See* ECF No. 1-1 at 3–4 ¶¶ 1(B)–(F).
[94] ECF No. 26-1 at 13.
[95] *Id.*
[96] ECF No. 28 at 20.

TORT ACTIONS, 2024 La. Sess. Law Serv. Act 423 (H.B. 315).[97] That one-year period "commences to run from the day injury or damage is sustained." LA. CIV. CODE ANN. art. 3492. "Damage is . . . sustained . . . only when it has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993). Merida's complaints confirm that, at the latest, he "sustained" the "injury or damage" that commenced the one-year prescriptive period on March 9, 2022—the day that he was fired and that Brenckle sent the allegedly libelous email. The allegations of Merida's complaints do not allow a reasonable inference that Merida "sustained" any "injury or damage" after March 2022.

Accordingly, because Merida's complaints make plain that Merida "sustained" the relevant "injury or damage" in March 2022, at the latest, Civil Code Article 3492's one-year prescriptive period began to run in March 2022. And because Merida waited over one year—until April 2023—to sue, Merida's tort claims are time barred by Civil Code Article 3492 unless his complaints raise a basis for tolling.

Merida's complaints do not raise a basis for tolling the one-year prescriptive period on his tort claims. Although Merida invokes the continuing-tort doctrine, it does not apply. "[T]he theory of continuing tort has its roots in property damage cases and requires that the operating cause of the injury be a continuous one which results in continuous damages." *Eagle Pipe & Supply, Inc., v. Amerada Hess Corp.*, 2010-

---

[97] Article 3492 was repealed and replaced by Article 3493.1 effective July 1, 2024. Article 3493.1 extends the prescriptive period for delictual claims from one year to two. *See* LA. CIV. CODE ANN. art. 3493.1. But Article 3493.1 has "prospective application only," and its two-year prescriptive period "shall apply to delictual actions arising after the [July 1, 2024] effective date of [Act 423]." TORT ACTIONS, 2024 La. Sess. Law Serv. Act 423 (H.B. 315). Because the alleged facts underlying Merida's claims occurred before July 1, 2024, the former Article 3492 and its one-year prescriptive period apply.

2267, p. 44 (La. 10/25/11); 79 So. 3d 246, 279 (internal quotation marks and citation omitted). "[A] continuing tort is occasioned by continual unlawful acts[,] and for there to be a continuing tort[,] there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant." *Id.* (internal quotation marks and citation omitted). "The inquiry as to whether there is continuous tortious conduct is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts." *Id.* (internal quotation marks and citation omitted). "[C]ourts look to the alleged injury-producing conduct of the tortfeasors to determine whether the conduct was perpetuated through overt, persistent, and ongoing acts." *Id.* (internal quotation marks and citation omitted). "Where the wrongful conduct was completed, but the plaintiff continued to experience injury in the absence of any further activity by the tortfeasor, no continuing tort [has been] found." *Id.* (internal quotation marks and citation omitted).

Here, the continuing-tort doctrine does not apply to save Merida's tort claims because Merida's complaints do not contain any well-pleaded factual allegations allowing the Court to reasonably infer that any Defendant "perpetuate[d]" any alleged injury to Merida "through overt, persistent, and ongoing acts." *Id.* (internal quotation marks and citation omitted). On the contrary, Merida's complaints confirm that all of "the wrongful conduct was completed" no later than March 9, 2022—when Merida was fired and when Brenckle sent the allegedly libelous email. *Id.* (internal quotation marks and citation omitted). Indeed, Merida's complaints do not allege "any further activity by the tortfeasor[s]" after March 9, 2022 *Id.* (internal quotation marks

and citation omitted). Finally, to the extent Merida intends to argue that Defendants' failure to retract Brenckle's allegedly libelous email constitutes a continuing tort, Merida would be wrong. Even if Brenckle's email were defamatory, "Defendants' failure to retract it or disseminate truthful information was not overt, persistent conduct causing successive damages day to day," and so "the continuing tort doctrine is inapplicable." *Alexander v. La. State. Bd. of Priv. Investigator Exam'rs*, 2015-0537, p. 20 (La. App. 4 Cir. 2/17/17); 211 So. 3d 544, 559 (internal citations omitted).

In sum, Merida's complaints confirm that any tort claims he intends to assert are time-barred under the former Article 3492. And Merida's complaints raise no basis for tolling. The Court therefore grants Defendants' Rule 12(c) motion to dismiss with prejudice all tort claims Merida intends to assert as time-barred.[98]

### D.    Conspiracy Claims

Next, Defendants contend that Merida fails to state any Section 1983 conspiracy claims against them because Merida's allegations are conclusory, and because any conspiracy claims are barred by the intra-corporate conspiracy doctrine.[99] Merida does not address Defendants' arguments. So, Merida has abandoned any Section 1983 conspiracy claims he intends to assert by failing to make any argument opposing dismissal of them in his Rule 12(c) response. *See, e.g., Black*

---

[98] Because the Court dismisses all of Merida's tort claims with prejudice as time-barred, the Court does not reach Defendants' alternative argument that Merida's negligence claims should be dismissed as barred by the exclusive-remedy provision of the Louisiana Workers' Compensation Law, LA. STAT. ANN. § 23:1032. *See* ECF No. 26-1 at 11–13.

[99] ECF No. 26-1 at 13–14.

*v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff "abandoned" a claim by failing to defend against its dismissal in response to dispositive motions).

Abandonment aside, Merida fails to plead facts plausibly establishing a Section 1983 conspiracy claim against any Defendant. To plead a plausible Section 1983 conspiracy claim, Merida "must allege facts that suggest [1] 'an agreement between the . . . defendants to commit an illegal act' and [2] 'an actual deprivation of constitutional rights.'" *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). Merida fails to plead facts plausibly establishing the first element. "Absent from the complaint[s] is any sufficiently pled agreement to violate [Merida's] constitutional rights." *Id.* The sole conspiracy allegation is that "Kelli Chandler conspired with defendants Durnin, Juneau, and Pinkston and carried out a plan to create a hostile work environment for plaintiff; target him for disparate treatment; and under color of law deprive him of his property right as a civil service employee of [the Flood Protection Authority] and employment in law enforcement in the future without just cause."[100] This "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. It is materially identical to the conspiracy allegations the Supreme Court found wanting in *Twombly*. *See id.* at 551.

Finally, Merida's Section 1983 conspiracy claims fail for a third independent reason: They are barred by the intra-corporate-conspiracy doctrine. The "intra[-]corporate-conspiracy doctrine . . . precludes plaintiffs from bringing conspiracy

---

[100] ECF No. 23 at 1 ¶ 1 (amending ¶ 37 of the original petition).

claims against multiple defendants employed by the same governmental entity." *Konan v. USPS*, 96 F.4th 799, 805 (5th Cir. 2024) (internal quotation marks and alterations omitted). "[A]n agency and its employees are a single legal entity which is incapable of conspiring with itself." *Id.* (internal quotation marks and citations omitted). The allegations of Merida's complaints confirm that Chandler, Durnin, Juneau, and Pinkston are all employees of the Board.[101] They are "incapable of" conspiring among themselves. *Id.* (internal quotation marks and citations omitted).

For each of these independent reasons, the Court grants Defendants' Rule 12(c) motion and dismisses with prejudice all of Merida's Section 1983 conspiracy claims.

### E.    Section 1983 Claims Against Durnin, Pinkston, and Juneau

Next, Defendants contend that Merida fails to state any Section 1983 hostile-work-environment claims against Durnin, Pinkston, and Juneau.[102] As for Durnin and Pinkston, Defendants contend that their alleged use of an unquestionably reprehensible racial epithet is not severe or pervasive enough to create an actionable hostile work environment under binding precedent.[103] And as for Juneau, Defendants contend that Merida does not allege any harassing conduct.[104] Merida counters that "the trier of fact" should decide whether Durnin's, Pinkston's, and Juneau's alleged conduct was severe enough to create an actionable hostile work environment, and

---

[101] Merida does not assert a conspiracy claim against Brenckle. *See id.*
[102] ECF No. 26-1 at 15–18. Merida does not assert a Section 1983 claim against Brenckle, and Defendants have not asked the Court to dismiss the Section 1983 claim against Chandler.
[103] *Id.* at 15–17.
[104] *Id.* at 18.

Merida submits that the reprehensible racial epithet that Durnin and Pinkston allegedly used "was extremely serious given the totality of the circumstances."[105]

Section 1983 permits Merida to "sue '[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State' violates his or her constitutional rights." *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (quoting 42 U.S.C. § 1983). To state a Section 1983 claim, Merida must plausibly allege (1) "the violation of a right secured by the Constitution and laws of the United States" (2) "committed by a person acting under color of state law." *Id.* (internal quotation marks and citation omitted). There is no vicarious liability under Section 1983, so Merida must plausibly allege "that each . . . [D]efendant, through the [Defendant's] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. For purposes of Defendants' Rule 12(c) motion, it is undisputed that Merida plausibly alleges that Durnin, Pinkston, and Juneau acted under color of state law. So, the dispositive question is whether Merida plausibly alleges that Durnin, Pinkston, and Juneau—through their own individual actions—violated the Constitution.

Merida posits that Durnin, Pinkston, and Juneau violated his rights under the Fourteenth Amendment's Equal Protection Clause on a hostile-work-environment theory. The Equal Protection Clause protects Merida "against a racially hostile work environment." *Johnson v. Halstead*, 916 F.3d 410, 417 (5th Cir. 2019). "A hostile work environment exists when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

---

[105] ECF No. 28 at 16.

conditions of [Merida's] employment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[106] "For harassment to alter the conditions of [Merida's] employment, 'the conduct complained of must be both objectively and subjectively offensive.'" *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1066 (5th Cir. 2023) (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007)). So, to qualify as "hostile," Merida's alleged environment must be "one that a reasonable person would find hostile or abusive, and one that [Merida] in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21–22).

The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). And so, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

To decide if Durnin's, Pinkston's, and Juneau's alleged conduct was sufficiently objectively offensive to alter the conditions of Merida's employment under Fifth Circuit precedent, the Court considers "[t]he totality of [Merida's] employment circumstances." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) (citing *Harris*, 510 U.S. at 23). "[N]o single factor is determinative" of that analysis. *Id.* But "pertinent considerations are: (1) 'the frequency of the discriminatory conduct'; (2) 'its severity'; (3) 'whether it is physically threatening or

---

[106] The hostile-work-environment analysis is the same under Section 1983 and Title VII. *See Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 166 (5th Cir. 2007).

humiliating, or a mere offensive utterance'; and (4) 'whether it unreasonably interferes with [Merida's] work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

"Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe," can establish a hostile work environment. *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007). For example, the Fifth Circuit has held that a single incident of a supervisor directly calling an employee a "Lazy Monkey A__ N____" in front of fellow employees was sufficiently severe to support a hostile-work-environment claim. *See Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022); *see also Thomas v. Cook Children's Health Care Sys.*, No. 22-10535, 2023 WL 5972048, at *3 (5th Cir. Sept. 14, 2023) (per curiam) ("[T]he single use of 'an unambiguously racial epithet' by a supervisor in the presence of subordinates can support a hostile-work-environment claim." (quoting *Woods*, 29 F.4th at 287)).

**Durnin.** Applying binding Fifth Circuit precedent, the Court is compelled to conclude that Merida fails to plead a plausible Section 1983 hostile-work-environment claim against Durnin based on Durnin's alleged use of the unquestionably reprehensible racial slur "spic." That is  for two independent reasons.

First, Merida fails to plead facts plausibly establishing that Merida "in fact . . . perceive[d]" Durnin's one-time use of the slur "spic" to be "hostile or abusive," as precedent requires. *Faragher*, 524 U.S. at 787 (citing *Harris*, 510 U.S. at 21–22).

Second, under the totality of the circumstances, Merida fails to plead facts plausibly establishing the objective component of his hostile-work-environment claim against Durnin. Merida's complaints include an alleged instance of discriminatory

harassment by Durnin: Merida alleges that Durnin "gave" Merida and Conaghan "the middle finger" and "muttered" "Fucking Spic" to Merida as Durnin "passed" Merida and Conaghan during a "business meeting" of the Board.[107] To be sure, the term "spic" is "an unambiguously racial epithet." *Woods*, 29 F.4th at 287. And Durnin's alleged use of the term undoubtedly qualifies as "severe" because it "evinces a clear animus against a particular national origin," *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017); *see also, e.g.*, *Ortiz v. Sch. Bd. of Broward Cnty.*, 780 F. App'x 780, 785 (11th Cir. 2019) (per curiam) ("Unambiguously ethnic slurs like 'spic' . . . surely fall on the more serve end of the spectrum of comments."); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950–51 (7th Cir. 2005) (stating that it was "difficult to imagine epithets more offense to someone of Hispanic descent" than "spic"). The Court condemns the term's alleged use in the strongest terms. Still, binding precedent requires the Court to consider the totality of the circumstances, including, among other things, whether Merida has pleaded facts plausibly establishing that Durnin's specific alleged use of the term was "physically threatening or humiliating" and whether Durnin's specific alleged use of the slur "unreasonably interfere[d] with [Merida's] work performance." *Harris*, 510 U.S. at 213. Merida failed to do so. That is, Merida does not allege that Durnin's one-time use of the slur "spic" was "physically threatening or humiliating." *Id.* Nor does Merida allege that Durnin's use of the slur "unreasonably interfere[d] with [Merida's] work performance.'" *Id.* And critically, Merida does not allege (or even contend) that Durnin was Merida's supervisor—distinguishing this case from *Woods*, which

---

[107] ECF No. 1-1 at 9 ¶ 33 (italics omited).

involved a one-time use of an unambiguously racial epithet by a supervisor. *See* 29 F.4th at 285; *see also, e.g., Arguello v. Conoco, Inc.*, 207 F.3d 803, 810 (5th Cir. 2000) (distinguishing conduct by supervisors from conduct by coworkers). In any event, Merida does not invoke *Woods* or contend that Durnin's use of the slur states an actionable hostile-work-environment claim under it. Accordingly, considering the totality of the circumstances, binding precedent compels the Court to conclude that Merida fails to plead facts plausibly establishing the objective component of his Section 1983 hostile-work-environment claim against Durnin.

In sum, for each of the independent reasons outlined above, precedent requires the Court to conclude that Merida fails to plead a plausible Section 1983 hostile-work-environment claim against Durnin. The Court dismisses the claim with prejudice.

**Pinkston.** Merida pleads a plausible Section 1983 hostile-work-environment claim against Pinkston based on Pinkston's allegedly calling Merida "spic" on one specific occasion and on unspecified "past numerous occasions."[108]

As relevant here, Merida alleges that, during a Board meeting, Pinkston "turned to [Merida] and asked [Merida] in the presence [of] Chandler, Patrick Conaghan and others attending the meeting[,] [h]ow is my favorite Mexican-Spic-Jew-Investigator[?]"[109] Pinkston allegedly made that unquestionably reprehensible remark "before a gathering of [Merida's] peers and supervisors with [Merida] as a speaker."[110] Merida alleges that Pinkston's remark "was demeaning, causing him

---

[108] ECF No. 1-1 at ¶ 28.
[109] ECF No. 1-1 at ¶ 26.
[110] *Id.* at ¶ 27.

embarrassment, humiliation, and extreme mental anguish."[111] Merida also alleges that Pinkston "referred to" him as a "Jewish–Spic" on unspecified "other past numerous occasions alone and in the presence of third parties."[112]

Unlike Merida's hostile-work-environment allegations against Durnin, the hostile-work-environment allegations against Pinkston are adequately pled. While Merida did not allege that Durnin's use of the slur "spic" was sufficiently offensive to Merida to alter the conditions of Merida's employment under binding precedent, or that Durnin's alleged use of the slur caused Merida to suffer humiliation, Merida specifically alleges that Pinkston's use of the slur at the Board meeting during which Merida was scheduled to speak "was demeaning, causing [Merida] embarrassment, humiliation, and extreme mental anguish."[113]

Under the totality of the circumstances, Merida pleads facts plausibly establishing the objective component of his Section 1983 hostile-work-environment claim against Pinkston. First, as for the severity of Pinkston's alleged discriminatory conduct, as noted above, "spic" is "an unambiguously racial epithet," *Woods*, 29 F.4th at 287, and Pinkston's directly calling Pinkston a "spic" on one specific occasion and "on other past numerous occasions"[114] undoubtedly qualifies as "severe," *Alamo*, 864 F.3d at 550. Second, as for the frequency of Pinkston's alleged discriminatory conduct, Merida alleges that Pinkston referred to him a "spic" during a Board meeting and "on

---

[111] *Id.*
[112] ECF No. 28 at ¶ 28 (italics omitted).
[113] *Id.* at ¶ 27.
[114] ECF No. 1-1 at ¶ 28.

other past numerous occasions alone and in the presence of third parties."[115] Third, as for whether Pinkston's alleged discriminatory conduct was "physically threatening or humiliating, or a mere offensive utterance," *Harris*, 510 U.S. at 23, Merida specifically alleges that Pinkston's particular use of the unquestionably reprehensible term—during an October 2021 Board meeting, "before a gathering of [Merida's] peers and supervisors[,] with [Merida] as a speaker"—"was demeaning, causing [Merida] embarrassment, *humiliation*, and extreme mental anguish."[116] Accordingly, on balance, Merida's factual allegations plausibly establish that Pinkston's alleged discriminatory conduct was sufficiently severe or pervasive to alter the conditions of Merida's employment.[117] The Court therefore denies Defendants' motion to dismiss Merida's Section 1983 hostile-work-environment claim against Pinkston.

**Juneau**. Merida fails to state a Section 1983 hostile-work-environment claim against Juneau. That is because Merida does not allege any discriminatory conduct by Juneau.[118] Because Merida does not allege facts plausibly establishing that Juneau, "through [his] own individual actions, has violated" the Equal Protection Clause by subjecting Merida to a hostile work environment, *Iqbal*, 556 U.S. at 676, Merida necessarily fails to plead a plausible Section 1983 hostile-work-environment claim against Juneau. The Court therefore grants Defendants' motion to dismiss Merida's Section 1983 hostile-work-environment claim against Juneau.

---

[115] *Id.*

[116] *Id.* at ¶ 27 (emphasis added).

[117] That Pinkston was not Merida's supervisor is not dispositive of Merida's hostile-work-environment claim against Pinkston because Merida alleges that Pinkston directly called him a "spic" on one specific occasion and on "other past numerous occasions," ECF No. 1-1 at ¶ 28, not just once. *Cf. Woods*, 29 F.4th at 285 (addressing a supervisor's one-time use of an unambiguously racial epithet).

[118] *See generally* ECF No. 1-1 at 3–18; ECF No. 23.

**F.**     **Official-Capacity Section 1983 Claims**

Finally, Defendants contend that the Court should dismiss any official-capacity Section 1983 claims that Merida intends to assert against Chandler, Brenckle, Durnin, and Juneau because they are duplicative of Merida's claims against the Board.[119] Merida does not address Defendants' argument. So, Merida has abandoned any official-capacity Section 1983 claims he intends to assert by failing to make any argument opposing dismissal of them in his Rule 12(c) response. *See Black*, 461 F.3d at 588 n.1. The Court therefore grants Defendants' motion to dismiss any official-capacity Section 1983 claims that Merida intends to assert.

---

[119] ECF No. 26-1 at 18–19.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' renewed Rule 12(c) motion[120] for partial judgment on the pleadings is **GRANTED IN PART** and **DENIED IN PART** as outlined above. Excepting Merida's Louisiana-law equal-protection claims and Merida's Section 1983 hostile-work-environment claim against Pinkston, all claims targeted by the motion are dismissed. To be clear, the only claims left in this lawsuit are (1) a Title VII claim against the Board, (2) a Section 1983 claim against the Board; (3) a Section 1983 claim against Chandler; (4) a Section 1983 claim against Pinkston; (5) a Louisiana-law equal-protection claim against the Board; (6) a Louisiana-law equal-protection claim against Chandler; (7) a Louisiana-law equal-protection claim against Durnin; and (8) a Louisiana-law equal protection claim against Pinkston.

New Orleans, Louisiana, this 20th day of September, 2024.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[120] ECF No. 26.