## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EDGAR L MERIDA,** | **CIVIL ACTION NO.  2:23-cv-01992** |
| **Plaintiff,** | **SECTION: "O"** |
| **VERSUS** | **JUDGE:  BRANDON S. LONG** |
| **BOARD OF COMMISSIONERS OF THE SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY-EAST, ET AL.** | **MAGISTRATE NO.  4** |
| | **MAGISTRATE:  KAREN WELLS ROBY** |
| **Defendants.** | |

### DEFENDANTS' MEMORANDUM IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Edgar Merida alleges that Defendant Southeast Louisiana Flood Protection Authority – East discharged him because of his Hispanic and Jewish heritages. But Regional Director Kelli Chandler, who made the decision, did not know he was Hispanic and Jewish. She had interacted with him on only one occasion where there was no reference to his heritage. Even if she had reviewed his personnel records, which she did not, Plaintiff had identified himself as Caucasian and not Hispanic. The records had no reference to his religion. Without knowledge, she could not have discriminated against him because of these characteristics. But she did know that he strongly disagreed with her decision to terminate the Agency's participation in the FBI joint task force to which he was assigned and that is what motivated her decision. Merida has no evidence that this reason was pretext for discrimination.

Mr. Merida also alleges he was subjected to a hostile work environment based on his Hispanic and Jewish heritages during his employment. The court previously concluded Plaintiff's allegations were enough to allow the claim to proceed past a motion to dismiss. But Plaintiff's

deposition testimony materially differs from the Complaint's allegations. Particularly, the Court's decision focused on the fact an incident occurred in the presence of his supervisor. But Plaintiff testified that incident occurred in the parking lot and that Ms. Chandler did not hear the comment. The testimony proves the conduct of which he complains is not sufficiently severe or pervasive to constitute actionable harassment. Further, even though he was himself a former human resource professional with training in harassment, he admitted he did not report the harassment, a necessary element of holding SLFPA liable.

Summary judgment should be entered dismissing all Plaintiff's claims.

## UNDISPUTED MATERIAL FACTS

## I.    BACKGROUND

The Southeast Louisiana Flood Protection Authority is the state agency responsible for flood control on the east bank of the Mississippi river in Orleans, Jefferson, and St. Bernard Parishes.[1] It is the successor to the former Orleans, East Jefferson, and St. Bernard Levee Districts which the Legislature merged into one entity following Katrina.[2] It manages and maintains the levee, flood wall, and other flood protection systems within its geographic jurisdiction.[3]

Before the merger, the East Jefferson Levee District and the Orleans Parish Levee District maintained police departments.[4] The legislation creating SLFPA maintained these organizations as distinct entities under the jurisdiction and control of SLFPA.[5]

SLFPA's employees, including police officers, are part of the state's civil service system under the Louisiana Constitution, Article X.[6] Civil service employees enjoy a variety of job

---

[1] Exhibit A, Kelli Chandler Declaration.
[2] *Id. See also* LSA – R.S. 38:330.1.
[3] *Id.*
[4] *Id.*
[5] *Id. See also* LSA – R.S. 38:330.7.
[6] LSA – R.S. 330.5.

FP 53628224.1

protections. The specific protections depend on whether an employee is probationary or has achieved permanent status.[7] Employees with permanent status cannot be discharged except for cause whereas probationary employees may be discharged at-will.[8]

Under the Civil Service system, only an entity or individual designated as an "Appointing Authority" for an agency can hire, fire, discipline, promote, or demote the agency's employees.[9] The Legislature designated the SLFPA Board of Directors as its Appointing Authority.[10] The Board has delegated that authority to its Chair.[11] The Chair in turn delegated it to the chief executive of the agency.[12] At the outset of Mr. Merida's employment to April 2021, the chief executive was Derek Boese.[13] From May 1, 2021 through the end of Mr. Merida's employment, the chief executive was Kelli Chandler.[14]

In 2012, the Legislature created the position of Police Superintendent as the ranking officer over both the EJLDP and the OLDP in the SLFPA.[15] Kerry Najolia was employed in this role from March 2017 to September 2021.[16] Each department had its own Captain reporting to Superintendent Najolia. During Mr. Merida's employment, in East Jefferson, Terry Durnin was the Captain and in Orleans, Mike Brenkle was the Captain.[17] Defendant Ken Pinkston is a Sergeant

---

[7] Louisiana Civil Service Commission Rules 9.1(e).

[8] Louisiana Constitution Article X, §8. Louisiana Civil Service Commission Rule 12.2.

[9] Louisiana Civil Service Rule 12.1

[10] LSA – R.S. 330.5.

[11] Exhibit B, By-Laws.

[12] Exhibits C and D, Delegations of Appointing Authority.

[13] Exhibit E, Hearing Transcript Testimony of Kerry Najolia, p. 107.

[14] Exhibit A, Kelli Chandler Declaration.

[15] LSA – R.S.

[16] Exhibit F, Merida deposition pp. 30. Merida deposition excerpts attached *in globo* as Exhibit F. Hearing Transcript Testimony of Kerry Najolia p. 103.

[17] Merida deposition pp. 38, 90.

in the East Jefferson Levee District Police.[18] Defendant Donald Juneau, now retired, was a Captain over Internal Affairs in the East Jefferson Levee District Police.[19]

## II.    PLAINTIFF'S HERITAGE AND EMPLOYMENT

Mr. Merida's maternal grandparents were Jews who immigrated to America from Israel.[20] He therefore identifies as Jewish but does not practice Judaism.[21] He is Hispanic in that his father was from Mexico.[22]

After a period of military service, Mr. Merida became a police officer working for the Jefferson Parish Sheriff.[23] In 2012, he retired.[24] Shortly thereafter, Mr. Merida volunteered as a reserve deputy for the East Jefferson Levee District Police.[25] In this role, he worked providing patrol services to the department.[26] Concurrently, he was employed by Ray Brandt Enterprises in the role of Director of Human Resources.[27] In this capacity, he created personnel policies, conducted investigations, gave training, and managed security.[28]

In 2019, Mr. Merida resigned from his position with Ray Brandt.[29] He applied for a full-time Patrol Officer II position with the EJLDP.[30] He was interviewed by, *inter alia,* Defendants Juneau and Durnin.[31] Captain Durnin offered him the position.[32] On August 26, 2019, he began

---

[18] Merida deposition p. 40.

[19] Merida deposition pp. 30 and 84.

[20] Merida deposition pp. 87 – 88.

[21] Merida deposition p. 125 – 126.

[22] Merida deposition p. 124.

[23] Merida deposition pp. 14 – 16.

[24] *Id. at* 16.

[25] Merida deposition pp. 23 – 24.

[26] Merida deposition pp. 24 – 25.

[27] Merida deposition p. 16.

[28] Merida deposition pp. 16 – 20.

[29] Merida deposition pp. 22 – 23.

[30] Merida deposition pp. 28 – 29.

[31] Merida deposition p. 30.

[32] *Id.* The formal hiring was done by then Appointing Authority Derek Boese.

4

his employment as a Police Officer II in a platoon on the night shift.[33] Around December 2019, an opportunity arose for the Flood Protection Authority to assign an officer to a Joint Task Force with the New Orleans FBI office.[34] Mr. Merida was selected for this role.[35] At this point, Mr. Merida began reporting for duty at the FBI office and no longer had regular duties with the EJLDP.[36] He did keep Captain Durnin apprised of the Task Force's major activities.[37] He remained an employee on the EJLDP roster.[38]

During this time, two other OLDP police officers, Pat Conaghan and Gerald Holmes, were assigned to federal task forces. Mr. Holmes was assigned to a Drug Enforcement Agency task force while Mr. Conaghan worked on the same FBI task force as Mr. Merida.[39]

Because Mr. Merida remained on the EJLDP active roster, it could not hire another officer to perform the regular platoon duties Mr. Merida had been performing.[40] To alleviate the resulting manpower shortage, then Police Superintendent Kerry Najolia in concert with Mr. Boese arranged for the creation of a new Investigator position within the Orleans Levee District Police Department.[41] The Investigator position was posted by State Civil Service.[42] Mr. Merida was selected.[43] This was a promotion and Mr. Merida received a raise.[44] This removed him from the EJLDP roster allowing it to fill the now empty PO II position.[45] Mr. Merida's duties did not change

---

[33] Merida deposition p. 36.
[34] Merida deposition pp. 42 – 43
[35] Merida deposition p. 44.
[36] Merida deposition pp. 45 – 46.
[37] Merida deposition p. 72.
[38] Merida deposition Exhibit 6.
[39] Merida deposition pp. 52 and 85.
[40] Merida deposition Exhibit 6.
[41] *Id.*
[42] *Id*.
[43] Merida deposition Exhibit 8.
[44] *Id.*
[45] Merida deposition Exhibit 6.

FP 53628224.1

and he continued to be assigned to the FBI Joint Task Force.[46] But as a member of the OLDPD, he moved from under EJLDP Captain Durnin into the chain of command of OLDPD Captain Brenckle.[47]

## III.   **SLFPA WITHDRAWS FROM THE JOINT TASK FORCE**

In April 2021, Derek Boese resigned from his position as Chief Administrative Officer.[48] The Board promoted Kelli Chandler, the then CFO, to the position of Regional Director.[49] Captain Durnin wrote a letter critical of the Flood Protection Authority's participation in federal task forces.[50] Ms. Chandler discussed the task force participation with both he and Captain Brenckle.[51] She decided to end the SLFPA's participation in the federal task forces.[52]

Ms. Chandler called a meeting for October 7, 2021 to notify the task force officers of her decision.[53] The meeting was attended by Ms. Chandler, Captain Durnin, Captain Brenkle, Captain Donald Juneau, Sergeant Ken Pinkston, Mr. Merida, and the other two task force officers, Pat Conaghan and Gerald Holmes.[54] This meeting was the first time Ms. Chandler and Mr. Merida interacted.[55] After being notified of the decision, Mr. Merida made a case for continuing to participate in the task forces.[56] Following a discussion, a decision was made to allow the task force participation to continue for a few months so that the officers could finish certain active cases.[57]

---

[46] Merida deposition p. 67.
[47] Merida deposition p. 69.
[48] Kelli Chandler Declaration.
[49] *Id.*
[50] Merida deposition Exhibit 15.
[51] Kelli Chandler Declaration.
[52] Kelli Chandler Declaration.
[53] Kelli Chandler Declaration.
[54] Merida deposition pp. 79 – 80.
[55] Merida deposition pp. 91 – 92.
[56] Merida deposition pp. 81 – 82.
[57] *Id.*

FP 53628224.1

In February 2022, the Officers were notified that the task force participation would end in March and they would return to the OLDP as patrol officers.[58] Mr. Merida remained opposed to this decision. On February 17, 2022, he attended an SLFPA public board meeting.[59] While there, he gave a presentation to the Board detailing the task force's successes and urging the Board to allow the officers to continue to serve on the task forces.[60] Ms. Chandler was present at this meeting, but she and Mr. Merida did not speak to each other.[61]

## IV.   <u>MS. CHANDLER DECIDES TO DISCHARGE PLAINTIFF</u>

Following the February 2022 meeting, Ms. Chandler reconsidered the decision to return the officers to patrol duties.[62] She believed, among other things, that their disagreement with the decision to end the task force participation would remain a source of contention.[63] She did not believe they would be a good fit for returning to patrol duties.[64]

Ms. Chandler discussed the situation with the Human Resources Department to understand her options.[65] Human Resources informed her that Officers Holmes and Conaghan were permanent employees and could not be discharged without cause.[66] Mr. Merida was in probationary status and was subject to discharge for any non-discriminatory reason.[67] Ms. Chandler therefore allowed

---

[58] Exhibit G; Email from Mike Brenckle to Ed Merida.
[59] Merida deposition p. 90 - 91.
[60] Merida deposition pp. 92 – 95.
[61] Merida deposition pp. 100.
[62] Kelli Chandler Declaration.
[63] Kelli Chandler Declaration.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*

FP 53628224.1

the reassignment of Holmes and Conaghan to move forward.[68] However, she chose to discharge Mr. Merida.[69]  She did not know that he was Hispanic and had Jewish heritage.[70]

## V.    <u>FACTS PERTAINING TO PLAINTIFF'S HARASSMENT ALLEGATIONS</u>

Mr. Merida alleges the following actions constituted harassment against him because of his Hispanic and Jewish heritage.

- At the October 2021 meeting, in the parking lot and outside the presence of anyone else, Sergeant Pinkston stated to him, "how's my favorite Jewish Spic investigator doing?"[71]

- At the February 2022 Board Meeting, Captain Durnin called him a "spic" and "flipped him off."[72]

- On other unspecified occasions, Sergeant Pinkston called him a Jewish Spic.[73]  Mr. Merida did not report any of these comments to anyone at SLFPA.[74]

## PROCEDURAL BACKGROUND

On September 20, 2024, the Court granted Defendants' Motion for Judgment on the pleadings in part and denied it in part. Dkt. 43. As held by the Court, the following claims are the sole ones remaining in this litigation:

> To be clear, the only claims left in this lawsuit are (1) a Title VII claim against the Board, (2) a Section 1983 claim against the Board; (3) a Section 1983 claim against Chandler; (4) a Section 1983 claim against Pinkston; (5) a Louisiana-law equal-protection claim against the Board;  (6)  a Louisiana-law equal-protection claim against Chandler;

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] Merida deposition p. 86.

[72] Merida deposition pp. 92 – 93. As noted, there is no separate 42 U.S.C. § 1983 claim remaining against Durnin based on these remarks.

[73] Merida deposition p. 102.

[74] Merida deposition pp. 106 and 118

(7) a Louisiana-law equal- protection claim against Durnin; and (8) a Louisiana-law equal protection claim against Pinkston.

## ARGUMENT AND LAW

I. **THE LOUISIANA EQUAL PROTECTION CLAUSE DOES NOT PROVIDE A CAUSE OF ACTION FOR EMPLOYMENT DISCRIMINATION**

It remains unclear what conduct Mr. Merida contends violated the Louisiana Constitution's Equal Protection clause. Regardless, those claims are legally deficient because the Fifth Circuit has held there is no individual private right of action for employment discrimination under this provision. "Washington alleges that she was discriminated against in violation of Article I, Section 3 of the Louisiana Constitution. This provision does not create a private right of action, however, and thus this claim fails." *Washington v. Louisiana*, 628 Fed.Appx. 914, 917 (5th Cir. 2015).[75]

II. **TITLE VII, 42 U.S.C. §1983, AND THE LOUISIANA EMPLOYMENT DISCRIMINATION LAW**

A. **THE FRAMEWORK FOR ASSESSING MR. MERIDA'S DISCRIMINATORY DISCHARGE CLAIMS**

Mr. Merida's discriminatory discharge claims under Title VII, the Louisiana Employment Discrimination Law, and 42 U.S.C. §1981.[76] While distinctions exist among them such as statutes of limitation, proper defendants, and administrative prerequisites, they apply the same standard to substantively analyze evidence of discrimination. *See Williams v. E.I. du Pont de Nemours & Co.*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015) *citing Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 468 (5th Cir. 2002) (Title VII and 42 U.S.C. §1981); *Turner v. Kansas City S. Ry. Co.*,

---

[75] If the Court disagrees, the following analysis of Mr. Merida's Title VII claims should apply equally to his Equal Protection Claims if they are based on the same conduct. While there are no cases discussing the elements of such a claim, there is no reason to analyze the evidence of discrimination or hostile environment harassment differently.

[76] Technically, because SLFPA is a state agency and the individuals are all state employees, the 42 U.S.C. §1981 claim is brought through the mechanism of 42 U.S.C. §1983. This does not change the substance of the claim and so Defendant will refer to it as a 42 U.S.C. §1981 claim. *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989) (Section 1981 affords no right of action versus state actors and 42 U.S.C. Section 1983 is the exclusive source for federal damages actions against state actors alleged to have violated Section 1981).

9

675 F.3d 887, 891 n. 2 (5th Cir. 2012), as revised (June 22, 2012)(Title VII and the Louisiana Employment Discrimination Law).[77]

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination.'" *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020). Mr. Merida has no direct evidence that Ms. Chandler's decision was based on his being Hispanic or Jewish. Therefore, he must proceed with the circumstantial evidence method.

When proceeding with circumstantial evidence, a discriminatory discharge claim is analyzed under the standard established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) aff'd, 528 F.2d 1102 (1976). Under this standard, Mr. Merida has the initial burden of raising an inference of discrimination by establishing a prima facie case of discrimination through circumstantial evidence. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1983). Establishing a prima facie case raises a rebuttable presumption of discrimination. The

---

[77] For preciseness, it should be noted that Mr. Merida asserts he was discriminated against and harassed on account of race and national origin for his Jewish and Hispanic heritages. He does not allege a religious discrimination as he is Catholic. Rather, the tenor of his discrimination claims for being Jewish is his Jewish ancestry. 42 U.S.C. §1981's prohibition on race discrimination has been interpreted to include both being Hispanic and being Jewish by birth. *Bonadona v. Louisiana Coll.*, No. 1:18-CV-00224, 2019 WL 4073247, at *2 (W.D. La. Aug. 28, 2019) citing *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) (protection as a race under § 1982). However, while Title VII prohibits discrimination on account of being Hispanic, it does not prohibit discrimination on account of having a Jewish heritage. *Id*. No cases were found addressing coverage of these characteristics under the Louisiana Employment Discrimination Law. However, because it is modeled after Title VII, it should also provide a cause of action based on being Hispanic, but not on Jewish heritage. *Smith v. Amedisys Inc*., 298 F.3d 434, 440 (5th Cir. 2002) ("Both Title VII and Louisiana employment discrimination statutes prohibit sexual harassment, discrimination, and retaliation, and Louisiana courts routinely look to federal law for guidance in determining whether a viable claim has been asserted.") Thus, to the extent Mr. Merida's claims are based on his Jewish heritage, his Title VII and LEDL claims against the Board must be dismissed.

employer can rebut this presumption by articulating a legitimate, non-discriminatory reason for its decision. *Id*. at 506 – 507.  The employer's burden at the rebuttal stage, which is one of production rather than proof, is "exceedingly light." *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

Once the employer meets this burden, the presumption of discrimination created by the prima facie case drops from the case. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "[T]he plaintiff must [then] show the proffered nondiscriminatory reason is merely pretext for … discrimination. *See Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013)." *Benjamin v. Felder Servs., L.L.C.*, 753 F. App'x 298, 302 (5th Cir. 2018), cert. denied, 139 S. Ct. 1622, 203 L. Ed. 2d 899 (2019). "To carry this burden, the plaintiff must rebut each non-discriminatory or non-retaliatory reason articulated by the employer." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007); *see also Wallace v. Methodist Hosp. System*, 271 F.3d 212 (5th Cir. 2001). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n.2 (1979) (stating that it is never the employer's burden to prove absence of discriminatory motive), cert. denied, 444 U.S. 1045 (1980).

### B.  MR. MERIDA CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AGAINST THE BOARD OR CHANDLER

#### 1.  The Elements of a Prima Facie Case of Discrimination

There is no universally applicable formula for the *prima facie* case, but it generally requires showing that the prohibited animus was overtly implicated or that the plaintiff was treated differently than similarly situated employees with different characteristics. *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). The typical formulation requires a plaintiff submit evidence sufficient to prove: (1) he is a member of a protected class, (2) he was qualified

11

for the position at issue, (3) he was the subject of an adverse employment action, and (4) there is direct evidence of discrimination; or he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Abarca v. Metro. Trans. Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). Additionally, "[I]n the case of discrimination based on a protected status of which the employer would not obviously be aware, as is, for example, sometimes the case with religion or national origin, the employee must show that the employer was sufficiently aware of the employee's status to have been capable of discriminating based on it." *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 723 (5th Cir. 2011). Plaintiff meets the first three elements in that he is a member of a protected class, was qualified for his job, and suffered an adverse action, discharge. He cannot prove the other two, that the decision maker knew his protected characteristics or that he was treated differently than similarly situated employees.

    2.    <u>Mr. Merida Cannot Establish a Prima Facie Case of Discrimination Because Chandler Did Not Know His National Origin or Religion</u>

Ms. Chandler discharged Mr. Merida. She did not consult any other supervisor on the decision. She has affirmatively stated that she did not know of Mr. Merida's Hispanic or Jewish heritage.[78] There was no reason for her to know. Ms. Chandler and Mr. Merida did not work together. Mr. Merida reported to work at the New Orleans FBI office and rarely reported to the Franklin Avenue Headquarters where Ms. Chandler worked. Mr. Merida testified that while he may have passed her and said hello, he had never personally interacted with Ms. Chandler before the October 2021 meeting.[79] The only other time he could recall seeing her was at the Agency's

---

[78] Kelli Chandler Declaration.

[79] Merida deposition pp. 91 – 92.

Board Meeting where he read his prepared statement regarding the FBI task force.[80] And Mr. Merida's Hispanic and Jewish heritage were not reflected in his personnel paperwork. Rather, Mr. Merida identified himself as Caucasian.[81]

As Ms. Chandler did not know of Mr. Merida's protected characteristics, she could not discriminate because of them. *See e.g. Roy v. Crews*, 712 F. App'x 367, 371–72 (5th Cir. 2017)("Since Phelps did not know Roy's race, her failure to hire Roy could not have stemmed from racial animus."); *Mousa v. Cap. Area Hum. Servs. Dist.*, 463 F. App'x 253, 254 (5th Cir. 2012)("[T]he uncontested facts reflected that the employer had no knowledge of Mousa's religion so no summary judgment evidence supports the plaintiff's argument that religion played a role in appellant's termination."); *Watts v. Sch. Bd. of St. Landry Par.*, 213 F. App'x 285, 286 (5th Cir. 2007)("Because Watts has not established that his employer knew of his religious beliefs, he cannot show that his failure to obtain a janitorial position was based on religious discrimination.") This lack of knowledge ends the analysis on the discriminatory discharge claims against the Board and Ms. Chandler under all laws. They must be dismissed.

3.     <u>Mr. Merida's Alleged Comparators Are Not Similarly Situated as a Matter of Law</u>

Even if an issue of fact on Ms. Chandler's knowledge existed, the discriminatory discharge claim would still fail. Mr. Merida claims discrimination because of the different treatment of the two other police officers called back from the task forces, Pat Conaghan and Gerald Holmes. Both Conaghan and Holmes were reassigned when the task forces ended. And they are not Hispanic or Jewish. But Conaghan and Holmes were permanent employees under the Louisiana Civil Service Rules and could only be terminated for cause. Contra, Mr. Merida was a probationary employee

---

[80] Merida deposition pp. 98 – 100.
[81] Merida deposition Exhibit 9.

FP 53628224.1

who could be let go for any reason. Under Fifth Circuit precedent, permanent civil service employees are not similarly situated to probationary employees. *Thomas v. Johnson*, 788 F.3d 177, 180 (5th Cir. 2015) (collecting cases). Mr. Merida has not proffered a comparator to make his prima facie case.

### C.    MR. MERIDA CANNOT ESTABLISH THE AGENCY'S LEGITIMATE REASON FOR HIS DISCHARGE WAS PRETEXT FOR DISCRIMINATION

Ms. Chandler discharged Mr. Merida because of his expressed opposition, both in October and five months later at the February Board meeting, to her decision to end the Agency's participation in the FBI Task Force. She believed given his views, he would be discontented returning to regular patrol duty and would sow discord by verbalizing his disagreement. This is a legitimate non-discriminatory reason.

Mr. Merida has no evidence to establish this reason is pretext for discrimination. When asked why he believed that his discharge was because of being Jewish and Hispanic, he pointed only to comments made by non-decision makers.

> Q. Well, why do you believe that your being Hispanic and/or Jewish played a role in the decision to terminate your employment?
>
> A. Why do I believe it?
>
> Because it seemed to be something that was preeminent in their minds, the minds of Brenckle, Durnin, and Pinkston, all three supervisors, that I never received from anyone else.
>
> Q. Okay. And do you know who made the decision to terminate your employment?
>
> A. No, sir.
>
> Q. And Miss Chandler never made a comment to you related to your national origin or your religion; correct?
>
> A. No, sir.

14

Q.  Other than the comments made by Brenckle, Pinkston, and -- one second -- Durnin, is there anything else about your termination that causes you to believe it was connected to your national origin or religion?

A.  No, sir.[82]

But Mr. Merida has no evidence Brenckle, Durnin, or Pinkston played any part in Ms. Chandler's decision to discharge him.[83] As such, their comments are not evidence of discrimination. The Fifth Circuit explained, "We assess the value of discriminatory remarks by examining whether the remarks indicated invidious animus and whether the speaker of the remarks was 'principally responsible' for the adverse employment action. Without a showing that the speaker of such remarks was a decisionmaker or had influence over a decisionmaker, a plaintiff cannot show discrimination." *Jones v. Louisiana Dep't of Health & Hosps.*, 471 F. App'x 344, 348 (5th Cir. 2012) (internal quotation and citations omitted). *See also Rios v. Rosotti,* 252 F. d 375, 378-379 (5th Cir. 2001) (racially disparaging remarks were not evidence of discriminatory intent when not made by decision maker or individuals who exerted influence over the decision maker). Thus, derogatory comments by Brenckle, Durnin, and Pinkston are not evidence Ms. Chandler discharged Mr. Merida because of his Hispanic or Jewish heritage.

## III.    HOSTILE ENVIRONMENT HARASSMENT

### A.    AGAINST THE BOARD

#### 1.    The Standards for Analyzing Hostile Environment Harassment

Mr. Merida's harassment claims against the Board are brought under Title VII, the LEDL, and 42 U.S.C. §1981. As with the discharge claims, identical analyses apply to the hostile environment claim under all three distinct laws *Cervantez v. Bexel Co. Civil Serv. Comm'n,* 99

---

[82] Merida deposition pp. 118 -119.
[83] Merida deposition pp. 118 -119.

F.3d 730, 734 (5th Cir. 1999) (Title VII and §1983 are "parallel causes of action"); *Hartley,* 370 So. 3d at 1159). Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The creation of a hostile work environment through harassment ... is a form of proscribed discrimination." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013).

2.    <u>Mr. Merida's Claim Is One of Co-Employee Harassment</u>

The paradigm for assessing employer liability for hostile environment harassment depends on whether the harasser was the plaintiff's supervisor or co-worker. If the harasser is a co-worker, then an employer will not be liable for the harassment unless it was aware of the harassment and failed to take prompt remedial action to stop the behavior. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). However, where the harasser is a supervisor, then the employer's liability is assessed under the parameters set out by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742 (1998).

The individuals Mr. Merida accuses of harassing him, Pinkston and Durnin, are not supervisors under *Vance.* "Supervisors" are employees whom the "employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'." *Vance v. Ball State Univ.*, 570 U.S. 421, 431, 133 S. Ct. 2434, 2443, 186 L. Ed. 2d 565 (2013) citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Supreme Court designed this to be an objective standard noting, "the question of supervisor status, when contested, can very often be resolved as a matter of law before trial." *Id.* at 443, 133 S. Ct. at 2450, 186 L. Ed. 2d at 565 (2013).

16

Durnin and Pinkston cannot be supervisors under Louisiana's civil service system because only the legally designated Appointing Authority may take tangible employment actions regarding employees. Louisiana Civil Service Rule 1.4; La. Stat. Ann. §38:330.5. Actions taken by individuals other than the Appointing Authority are void. *DuBois v. Dep't of Health & Hum. Res.*, 448 So. 2d 230, 231 (La. Ct. App. 1984); *Pellitteri v. Orleans Levee Dist.*, 633 So. 2d 615, 616 (La. Ct. App. 1993), writ denied, 634 So. 2d 861 (La. 1994), and writ denied sub nom. *Herrell v. Tempco Pers.*, 635 So. 2d 1102 (La. 1994). Thus, only Ms. Chandler satisfies the *Vance* definition of supervisor. *See e.g., Cubas v. St. James Par. Sch. Bd.*, 2021 WL 6196977, at *9 (E.D. La. Dec. 30, 2021) (only authorized decision maker as supervisor under *Vance)*. Because Pinkston and Durnin are not supervisors under *Vance,* the co-employee hostile environment analysis applies.

### 3.    The Standards for Assessing Co-Employee Harassment.

"A plaintiff may establish a Title VII violation based on race discrimination creating a hostile work environment. In order to establish a hostile working environment claim, [the plaintiff] must prove: (1) [he] belongs to a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Plaintiff has no evidence to prove the fourth or fifth elements of his claim.

### 4.    Mr. Merida's Failure to Report the Alleged Harassment Defeats His Claim

Mr. Merida's claim against the Board fails because he never reported it and so the Board was unaware.

> Establishing employer knowledge requires that someone with the authority to stop the harassment know about it. That is because "[a]n employer can be put on notice of harassment, and therefore be

17

> required to take remedial action, [only] if a person within the organization who has the 'authority to address the harassment problem' or an 'affirmative duty' to report harassment learns of the harassment in question." *Abbt v. City of Houston*, 28 F.4th 601, 607 (5th Cir. 2022) (quoting *Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir. 1998)). "[T]he key to whose knowledge may be imputed to the employer is remedial power: There is no actual knowledge until someone 'with authority to address the problem' is notified." *Sharp v. City of Houston*, 164 F.3d 923, 929–30 (5th Cir. 1999) (citation omitted).

*Johnson v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 457 (5th Cir. 2024).

Mr. Merida admitted he told no one about Sergeant Pinkston and Captain Durnin's alleged conduct.

> Q.  All right.  So did you complain to – did you report Mr. Pinkston's behavior to anyone?
>
> A.  No, sir.[84]
>
>           ***
>
> Q.  Did you report Terry Durnin's conduct and statement at the board meeting to anyone at the Flood Authority?
>
> A.  No.[85]

An employee's failure to report harassment is fatal to a co-worker harassment claim. *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 299–300 (5th Cir. 2001) ("Woods had the obligation to report the alleged harassment to Delta Beverage as she had been instructed. Her failure to do so is fatal to her case."). *See also Lain v. Entergy Louisiana, LLC*, 2021 WL 2954403, at *8 (W.D. La. 2021), *aff'd sub nom. Lain v. Entergy Louisiana, L.L.C.*, 2022 WL 1056090 (5th

---

[84] Merida deposition p. 106.
[85] Merida deposition p. 118.

Cir. 2022) ("Lain cannot meet the fifth element because he never reported the conduct and never gave Entergy an opportunity to take remedial action.").

Mr. Merida was a Human Resources Manager for approximately 8 years. He was responsible for investigating complaints of harassment and training employees about harassment. When he was hired into his full-time role with the Flood Authority, he received and signed an Employee Handbook that included instructions on how to report harassment.[86] Yet he did not complain about the harassment. He cannot now seek damages for that conduct.

5.    <u>Mr. Merida Cannot Establish the Fourth Element: The Harassment Affected a Term, Condition, or Privilege of Employment</u>

To prove that harassment affected a term, condition, or privilege of employment, a plaintiff must show that the conduct was "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Harvill v. Westward Commc'ns, L.L.C*, 433 F.3d 428, 434 (5th Cir. 2005). The Supreme Court has made clear that this is a high burden:

> The prohibition of harassment…forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

*Harris*, 510 U.S. at 21. *See also Ramsey*, 286 F.3d at 268.

In determining whether an environment is hostile, several factors are relevant in the inquiry: (1) frequency of the discriminatory conduct; (2) the severity; (3) whether the conduct is physically threatening, or a mere offensive utterance; (4) whether the conduct unreasonably interferes with an employee's work performance; and (5) the conduct's effect on the employee's

---

[86] Merida deposition Exhibit 7. Exhibit H, SELA Flood 000242 – 243.

psychological well- being. *Id.* At 22-23. *See also Ramsey*, 286 F.3d at 268. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) *citing Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

As explained by the Fifth Circuit, to determine whether a hostile environment exists, the analysis focuses on the "totality of the circumstances." Crucial to this inquiry is whether the alleged conduct unreasonably interfered with the plaintiff's work performance. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007).

      6.    <u>The Conduct by Durnin and Pinkston Was Not Severe or Pervasive.</u>

In denying the Motion for Judgment on the Pleadings, the Court held Mr. Merida adequately <u>alleged</u> the existence of a hostile environment based on the allegations against Pinkston.

> Merida specifically alleges that Pinkston's use of the slur at the Board meeting during which Merida was scheduled to speak "was demeaning, causing [Merida] embarrassment, humiliation, and extreme mental anguish." Under the totality of the circumstances, Merida pleads facts plausibly establishing the objective component of his Section 1983 hostile-work-environment claim against Pinkston. First, as for the severity of Pinkston's alleged discriminatory conduct, as noted above, "spic" is "an unambiguously racial epithet," Woods, 29 F.4th at 287, and Pinkston's directly calling Pinkston a "spic" on one specific occasion and "on other past numerous occasions" undoubtedly qualifies as "severe," Alamo, 864 F.3d at 550. Second, as for the frequency of Pinkston's alleged discriminatory conduct, Merida alleges that Pinkston referred to him a "spic" during a Board meeting and "on other past numerous occasions alone and in the presence of third parties." Third, as for whether Pinkston's alleged discriminatory conduct was "physically threatening or humiliating, or a mere offensive utterance," Harris, 510 U.S. at 23, Merida specifically alleges that Pinkston's particular use of the unquestionably reprehensible term—during an October 2021 Board meeting, "before a gathering of [Merida's] peers and supervisors[,]

20

with [Merida] as a speaker"—"was demeaning, causing [Merida] embarrassment, humiliation, and extreme mental anguish."116 Accordingly, on balance, Merida's factual allegations plausibly establish that Pinkston's alleged discriminatory conduct was sufficiently severe or pervasive to alter the conditions of Merida's employment.

But Mr. Merida's testimony undermines the allegations on which this conclusion rested. Particularly, Mr. Merida testified that the comment by Pinkston did not occur in a meeting in front of his supervisor. It happened in the parking lot before the meeting in the presence of one other officer.

A. Before -- when we walked into the meeting, before, as we were standing outside, Pinkston walked up with his usual bigoted self and asked how's my favorite Jewish Spic investigator doing.

Q. You say you were standing outside. Was that outside the station?

A. Yeah. Yeah. Well, outside the conference room, yeah. We were within the perimeter, but outside the door, the entrance door.

*** 

Q. Now, when you had this meeting in front of Kelli Chandler, and you described the room, or you were asked to describe the room, was -- when you were called those names, was that within the hearing distance of Kelli Chandler?

A. No. It was outside in the parking lot prior to Miss Chandler's arrival.[87]

Mr. Merida testified it did not affect his work.

Q. All right. Did you ever let Mr. Pinkston's comment impact your ability to do your police work?

A. Of course not.[88]

While he _alleged_ this remark caused him extreme mental distress, his testimony does not support the allegation. Instead, his anger was directed to his inability to retaliate.

---

[87] Merida deposition pp. 84 – 86; 170 – 171.
[88] Merida deposition p. 118.

> Q. … when Durnin shot you the bird and called you that in the meeting, did that cause you a great deal of pain and suffering, or did you --
>
> A. It hurt me, more than that, I wasn't able to strike back. It hurt me more than I just had to sit there and eat it, from a person like that.[89]

Mr. Merida could provide no detail about any other occasion he claims Pinkston used derogatory language toward him.[90] General allegations of harassment should not be considered; instead, a court should only consider specific allegations. *Barkley v. Singing River Elec. Power Ass'n*, 433 F. App'x 254, 258 (5th Cir. 2011); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1049 (5th Cir. 1996) (finding that a general allegation of racist remarks insufficient to establish prima facie claim of hostile work environment); *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020)("general allegations of racial slurs, without detail, context, date or circumstances, are insufficient to establish a hostile work environment.") A plaintiff's self-serving testimony that he was subjected to slurs "all the time" with no supporting evidence and no details of context, place, or time is insufficient to create a triable issue of fact. Accepting such testimony as sufficient would allow a plaintiff to circumvent the totality of the circumstances analysis by simply not providing the circumstances at all.

## B. THE §1983 CLAIM AGAINST PINKSTON FAILS BECAUSE THE ALLEGED HARASSMENT WAS NOT UNDER THE COLOR OF STATE LAW

Mr. Merida's §1983 harassment claims against Defendant Pinkston fail as explained above because the conduct was not sufficiently severe or pervasive to constitute a hostile environment. It also fails because co-worker harassment is only actionable under §1983 where it is carried out under the color of state law.

---

[89] Merida deposition p. 132.
[90] Merida deposition pp. 104 – 106.

FP 53628224.1

"Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law." *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir.1996) (citing Polk County v. Dodson, 454 U.S. 312, 319–20, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). The Tenth Circuit has rejected the contention that co-worker harassment was done under color of law "when the harassment did not involve use of state authority or position." *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir.1992) (citing cases). "The dispositive issue is whether the defendant acted pursuant to power he or she possessed by state authority." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir.1995).

When the alleged harassment does not involve the use of either state authority or position, courts have declined to find co-workers liable under section 1983. *Id.; Woodward*, 977 F.2d at 1400 (defendant law enforcement officers were not liable under section 1983 for sexually harassing dispatchers employed by a separate employer); *Hughes v. Halifax County Sch. Bd.*, 855 F.2d 183, 186–87 (4th Cir.1988) (co-workers were not acting with state authority when they taunted plaintiff and performed a mock hanging of plaintiff); *Murphy v. Chicago Transit Auth.*, 638 F.Supp. 464, 468 (N.D.Ill.1986) (staff attorneys who sexually harassed fellow staff attorney were not liable pursuant to section 1983). Here, the summary judgment facts clearly establish Richardson was a co-worker with no supervisory control or authority over Ottman. Because Richardson was a private actor, he is not liable pursuant to section 1983.

*Ottman v. City of Indep., Mo.*, 341 F.3d 751, 762 (8th Cir. 2003). Mr. Merida presents no evidence showing Pinkston used any state authority or his position when allegedly making the harassing statements. It was allegedly simply a greeting.[91] The claim fails.

### C.    THE §1983 CLAIM FOR NOT ACTING TO STOP THE HARASSMENT FAILS BECAUSE PLAINTIFF DID NOT REPORT IT

Mr. Merida claims Chandler and the Board are liable to him under §1983 for failing to stop the alleged harassment.[92] Inaction in the face of harassment can violate §1983, but the standard to prove such a violation is high.

---

[91] Merida deposition p. 105.
[92] First Amended Complaint ¶64(d), Docket No. 23.

FP 53628224.1

> Halstead must have been deliberately indifferent to this racially hostile work environment. This is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Johnson thus must allege that repeated complaints of civil rights violations were followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.

*Johnson v. Halstead*, 916 F.3d 410, 418 (5th Cir. 2019) (citations and internal quotations omitted).

Merida admits he did not report Pinkston and Durnin's conduct and has no evidence Chandler or anyone in authority was aware of the alleged conduct. His §1983 claim for failing to prevent harassment fails.

IV.   <u>**CONCLUSION**</u>

All remaining claims must be dismissed with prejudice.

DATED:  February 13, 2025.

Respectfully submitted,

*/s/Edward F. Harold*
EDWARD F. HAROLD
Louisiana Bar No. 21672
LARRY J. SOROHAN
Louisiana Bar No. 26120
FISHER & PHILLIPS LLP
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170
Telephone: (504) 522-3303
Email:  eharold@fisherphillips.com
        lsorohan@fisherphillips.com

**COUNSEL FOR DEFENDANTS**

FP 53628224.1